[Crim. No. 5040. Second Dist., Div. One. Dec. 21, 1953.]

THE PEOPLE, Respondent, v. ARNOLD SEVERINO, Appellant.

Arnold Severino, in pro. per., for Appellant.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, Roy A. Gustafson, District Attorney (Ventura), and Albert J. Holzhauer, Deputy District Attorney, for Respondent.

WHITE, P. J.—In an amended information filed by the district attorney of Ventura County defendant was charged in Count I with the crime of conspiracy to solicit for a prostitute and in Count II with the offense of soliciting for a prostitute.

Following the entry of not guilty pleas as to both counts, the cause proceeded to trial before a jury which returned verdicts finding defendant guilty on both counts. Probation was denied and defendant was sentenced to state prison. This appeal is from the judgments of conviction.

. Viewing the facts elicited at the trial in a light most favorable to the prosecution, as we are required to do following a guilty verdict, we find in the record evidence that on January 31, 1953, while visiting a house of prostitution known as the "Casa Blanca Bungalows," in Ensenada, Mexico, defendant met Richard Hocking and his wife, Bettina Hocking. Mr. Hocking was employed as night manager and Mrs. Hocking worked as a prostitute for the house of prostitution. Defendant and Richard Hocking talked of several "deals" including running guns from the United States into Mexico; selling defendant's automobile, which was registered to defendant but legally owned by a finance company, in Mexico and then reporting it stolen upon defendant's return to the United States so that defendant "could pick up payment off it"; and whether Hocking knew where defendant and a companion of his could "pick up marijuana." Hocking offered to assist defendant in selling his automobile. Defendant, a member of the United States Air Force and stationed at the Oxnard Air Force Base, Oxnard, California, told Hocking that he would return to Ensenada on Monday night and that he would try to sell his car in Mexico and return to

Oxnard by bus. Defendant then drove to his base in Oxnard, arriving there about 2 o'clock Monday morning, February 2.

About 10 o'clock that same morning defendant prepared to return to Mexico. An Air Force acquaintance, Donald S. Hamilton, agreed to share expenses with defendant and accompany him to Mexico. They drove to Ensenada, Mexico, arriving at the "Casa Blanca Bungalows" at about 9:30 o'clock Monday evening. They were met at the motel by Richard Hocking who stated that it was getting "too hot" for him in Ensenada and that he wanted to get a ride back "across the line" with defendant in his car. Defendant and Richard Hocking held a conversation in Hocking's room at the motel. Mrs. Hocking was in the room for a few minutes until her husband asked her to leave. Donald Hamilton was present and overheard a portion of the conversation but did not participate in it. Defendant discussed the possibilities of opening a house of prostitution in Oxnard, California, how many servicemen were there and how easy it would be to make money in Oxnard by opening such a house. Hocking appeared to be in agreement with what defendant had to say. Defendant stated that he would transport Hocking to Oxnard for the purpose of setting up a house of prostitution. Donald Hamilton left the room and defendant and Hocking continued with their conversation. Defendant agreed to take Mrs. Hocking along with them to Oxnard. Mrs. Hocking packed her clothes. Defendant had an act of sexual intercourse with Mrs. Hocking and paid her $3.00.

Defendant, Hamilton, and the Hockings left Ensenada, and defendant drove the automobile. During the trip they subject of conversation between defendant and Hocking was prostitution and how to operate it successfully. Hamilton never entered into or participated in this discussion.

On the way to Tijuana, defendant and Hocking talked about opening a house of prostitution in Oxnard. In Tijuana, defendant and Mr. and Mrs. Hocking made an unsuccessful search to find girls to take to Oxnard for the purpose of prostitution. After defendant crossed the border at Tijuana, he suggested that Mrs. Hocking could be used for the purpose of prostitution in connection with their plans if other girls couldn't be found. Although there was no specific plan agreed upon as to how they were to operate upon arrival in Oxnard, defendant and the Hockings continued to express their ideas on the subject of prostitution with a view toward its successful exploitation in Oxnard.

At Malibu Beach, at defendant's request, Hamilton changed places with him and drove the car to Oxnard. When they arrived at Oxnard, defendant was awakened. He directed Hamilton to the Sequoia Hotel. Mr. and Mrs. Hocking registered at the Sequoia Hotel at about 1:30 p. m., Tuesday, February 3, 1953. Hamilton and the defendant returned to the Air Force base at Oxnard. Hamilton parked the car at the front gate. Defendant remained in the car asleep. Hamilton went on the base in search of his automobile. Four or five hours later Hamilton awakened defendant, who was still asleep in his parked automobile, and asked if he could use defendant's car to locate Hamilton's automobile. Hamilton and defendant went to Camarillo looking for the latter's automobile. They were unsuccessful and defendant requested that Hamilton drive to the Sequoia Hotel. Just before they reached the city limits of Oxnard defendant told Hamilton that he and the Hockings were going to split the money that they made three ways. Defendant offered Hamilton a share of defendant's split if Hamilton would get customers for him. Hamilton replied that defendant ''was crazy to think he could get away with such an idea'' and drove defendant to the Sequoia Hotel.

Mr. and Mrs. Hocking got into the automobile and defendant drove around Oxnard. He pointed out several night spots in Oxnard and explained that servicemen frequented those places and that they could go into the bars before closing time, pick out the customers and take them up to the room. As they departed from Oxnard by way of East Fifth Street, defendant pointed to the Pacific Labor Camp and explained that if they couldn't pick up servicemen in Oxnard, they could ''work'' the camps until they ''got set on their feet.'' As they drove past Rose Road, defendant indicated that Rose Road would be a safe place to work because the police never patrolled that area. Defendant pointed to a six or eight room house near the Air Force Base that would be ideal for a house of prostitution since it was close to the base and the servicemen wouldn't have any great distance to walk.

As they passed the Air Force Base they observed a house trailer. Defendant commented that perhaps they could rent such a trailer, operate out of it and move it from camp to camp. They arrived in Camarillo where Hamilton got out of the defendant's automobile and went away with some friends. This was the last time that Mr. and Mrs. Hocking saw Hamilton. Defendant then returned the Hockings to Oxnard.

The next evening, defendant and Mr. and Mrs. Hocking looked at a house near the Air Force base that "looked suitable" for a house of prostitution. Defendant inquired of a lady living adjacent to it and was told that a road was going through and that all the houses along that road were to be moved. That evening definite plans were made to go out the following night to the labor camps. It was agreed between defendant and Hocking that they would go out to the Mexican labor camps and pick up the men from the camps, taking them two at a time. Defendant stated that they could park on Rose Road and use the car to prostitute Mrs. Hocking. The price was to be set at five or ten dollars. If they couldn't get ten dollars, they would take five dollars. Defendant demanded a 50 per cent split of the proceeds of the prostitution because his car was to be used and because his risk was greater due to his being a member of the Air Force.

On Thursday evening, February 5, 1953, a little after 8 o'clock, defendant transported Mr. and Mrs. Hocking to the Pacific Labor Camp on East Fifth Street, in Oxnard. Three or four men were standing in front of the gate. Defendant's car was parked across the road from the camp. As three of the men crossed over to defendant's automobile, defendant reminded Mrs. Hocking to charge five dollars and to collect in advance. Speaking in Spanish, Mr. Hocking inquired of the men whether they wanted a girl and told them it would cost five dollars. After a short discussion among themselves, three of the men said they "wanted to go." Defendant stated that they could take two of them, bring them back and take some more. Two of the men got into defendant's automobile. Ramon Castillo was seated in the rear seat with Mrs. Hocking and Raimundo Vasquez was seated in the front, next to Mr. Hocking. Defendant started his car, turned around and proceeded east on East Fifth Street. Turning north on Rose Road, defendant parked his car on the left hand side of the road about 150 yards north of East Fifth Street, behind a hedge of trees.

It was dark. Defendant, Hocking and Vasquez got out of the car and walked across the road. Mrs. Hocking asked Castillo for the money and the latter handed her a 10 dollar bill. Mrs. Hocking called for change. Defendant walked close to the car and Mrs. Hocking handed the 10 dollar bill to defendant who removed his wallet from his pocket and handed the change back to Mrs. Hocking. Mrs. Hocking handed Castillo five dollars change. Mrs. Hocking removed

her skirt and panties and placed them on the front seat. Castillo removed his trousers and attempted to have an act of sexual intercourse with Mrs. Hocking. They were unsuccessful and Castillo asked Mrs. Hocking to go outside with him. Mrs. Hocking, carrying a blanket, left the car with Castillo and went into the trees, to the left of the car. Mrs. Hocking was in the process of spreading the blanket when the police arrived.

Police Officers White and Hubbard had been patrolling on Rose Road in a police car. When they noticed defendant's unattended automobile parked on the wrong side of the road, they stopped to investigate. The officers first noticed defendant and questioned him. Defendant claimed that he had "stopped for a latrine break" and argued that the Mexican nationals were not with him. When the officers found the woman's panties and skirt in the front seat of defendant's car, the officers asked defendant where the woman was. Defendant stated: "there isn't any woman around here. The skirt and pants belong to my wife." Officer Hubbard took defendant and Vasquez to the police station in defendant's automobile. Castillo and Mr. Hocking got into the patrol car with Officer White. On the way to the police station, Hocking asked Officer White to return to get his wife. Turning back, Officer White found Mrs. Hocking walking out from behind the trees with a brown blanket wrapped around her. At the police station defendant and Mr. and Mrs. Hocking were searched. Defendant was the only person searched who had a 10 dollar bill in his possession.

■ Appellant first attacks the sufficiency of the amended complaint. The substantive part thereof reads as follows:

"COUNT I

"The District Attorney of the County of Ventura hereby accuses ARNOLD SEVERINO of the crime of violation of Section 182 of the Penal Code (conspiracy to violate Sec. 1 of Act 1907 of Deering's General Laws) in that on or about February 2, 1953, in the County of Ventura, State of California, he did unlawfully agree and conspire with Richard Edgar Hocking to solicit or receive compensation for soliciting for a prostitute, Bettina Hocking, knowing the said Bettina Hocking to be a prostitute.

"OVERT ACT No. 1

"That pursuant to said agreement and conspiracy, and to carry out the objects and purposes of the same, the said ARNOLD SEVERINO together with Richard Edgar Hocking,

transported Bettina Hocking in the automobile driven by ARNOLD SEVERINO to East 5th Street and Rose Road in Oxnard, California, on or about February 5, 1953, for the purpose of having sexual intercourse with Ramon Ornelas Castillo and Raimundo Vasquez.

## "COUNT II

"For a further and separate cause of action, being a different offense of the same class of crimes and offenses as the charge set forth in Count I hereof, and connected in its commission, the said ARNOLD SEVERINO is further accused by the District Attorney as follows:

"That ARNOLD SEVERINO committed the crime of violation of Section 1 of Act 1907 of Deering's General Laws in that on or about February 5, 1953, in the County of Ventura, State of California, knowing Bettina Hocking to be a prostitute, he did solicit or receive compensation for soliciting for such prostitute."

Appellant's claim that the acts described in the information do not constitute crimes under any California law is answered by the fact that the allegations of Count I constitute a crime under the provisions of Statutes of 1911, chapter 15, page 10, as amended by Statutes of 1921, chapter 100, page 96, and in said count defendant was accused of conspiring with another to commit the acts which constitute a crime under the aforesaid statutes. And, conspiring "to commit any crime" is made a criminal offense under section 182 of the Penal Code. In Count II, defendant was charged with having solicited or received compensation for soliciting for a named person whom he knew to be a prostitute. This is denounced as a crime by the aforesaid Statutes of 1911, as amended by the Statutes of 1921.

Appellant urges that he was and is thoroughly confused by the fact that in referring to the foregoing statutory law, the amended information designated it by its unofficial citation, that is "Act 1907, Deering's General Laws." ██ There is no requirement or procedure that requires the information to name the statute which the accused is charged with violating. It is enough that he be advised of the act which he is charged with having committed (together with the particulars required by Pen. Code, §§ 951, 952). In the case now engaging our attention, there was compliance with the code sections just cited. It was, therefore, immaterial that the law was designated in the information by its unofficial, rather than its official citation. In numerous cases, the unofficial

180

citation has been accepted by the courts without question. (See *People* v. *Giambone,* 119 Cal.App.2d 338, 339 [259 P.2d 10] ; *People* v. *Israel,* 91 Cal.App.2d 773, 776 [206 P.2d 62].)

Appellant next contends that the amended information is defective because it fails to specify therein that he was a male. As contended by appellant, one of the elements or conditions that must exist to constitute the offense is that the accused must be a male person. But in the case at bar the allegation that the appellant is a male person would be of no aid to him, since that is a matter peculiarly within his own knowledge, and, whether guilty or innocent, he is equally apprised of his sex. No showing of prejudice to appellant is shown. And, appellant's premise that only a male can commit the crime charged is erroneous because a female may, under certain conditions, be found guilty of the crimes charged in the amended information (*People* v. *Young,* 132 Cal.App. 770, 771, 772 [23 P.2d 524]).

We find no merit in appellant's contention that the amended information is defective because it fails to allege that the named prostitute is a female. Prostitution has been justifiably defined as the common, indiscriminate, illicit intercourse of a *woman* for hire. (*People* v. *Mitchell* (1949), 91 Cal.App.2d 214, 217 [205 P.2d 101] ; *People* v. *Marron* (1934), 140 Cal.App. 432, 434 [35 P.2d 610].) A prostitute is "*a woman* who offers herself indiscriminately to sexual intercourse for hire." (*People* v. *Phillips* (1945), 70 Cal.App.2d 449, 452 [160 P.2d 872] ; Webster's New Internat. Dict. (2d. ed).) Therefore, the designation of Bettina Hocking as a prostitute sufficiently identifies her as a female person within the meaning of the statute. (*People* v. *Anonymous,* 161 Misc. 379 [292 N.Y.S. 282] ; *Cole* v. *State* (1922), 156 Ark. 9 [245 S.W. 303].)

Equally without merit is appellant's claim that the failure to designate in the amended information that the acts charged were done "wilfully, maliciously, and feloniously" invalidating the pleading. An unlawful act is presumed to have been done with the intent to violate the law. (*People* v. *Murphy* (1936), 17 Cal.App.2d 575, 585 [62 P.2d 592] ; *People* v. *Harris* (1866), 29 Cal. 678; *People* v. *Montgomery* (1941), 47 Cal.App.2d 1 [117 P.2d 437] ; Pen. Code, §§ 7 and 21.)

The amended information did allege the only specific mental element necessary in the crimes charged—that appel-

lant had knowledge that the person for whom he was soliciting was a prostitute.

■ Appellant's contention that the amended information is deficient because it failed to designate the crimes as felonies was rejected in *People* v. *Smith,* 215 Cal. 749, 751 [12 P.2d 945].

■ The accusatory pleading in the instant case is so worded as to give appellant notice of the offenses with which he is charged. That is all the law requires. (Pen. Code, § 952; *People* v. *Roberts,* 40 Cal.2d 483, 486 [254 P.2d 501]; *People* v. *Pierce,* 14 Cal.2d 639, 644 [96 P.2d 784]; *People* v. *Longo,* 119 Cal.App.2d 416, 418 [259 P.2d 53]; *People* v. *Benenato,* 77 Cal.App.2d 350, 362 [175 P.2d 296].) At no time during the trial did appellant or his counsel assert that either of them were unaware of the charges made against the former. Finally, as to all the criticisms of the information, the suggestion may be made that any defect therein was rendered innocuous and is shown to have been without prejudice by the evidence at the trial.

Relying on section 1049 of the Penal Code which provides that a defendant, upon entering his plea, is entitled to at least five days within which to prepare for trial, appellant insists that since his plea to the amended information was entered only two days before trial, he was deprived of his legal rights, and "did not have sufficient time to prepare for trial."

In advancing this claim appellant overlooks the provisions of section 1009 of the Penal Code which provides, in part, that when an information is amended ". . . the trial or other proceeding shall continue as if the pleading had been originally filed as amended, unless the substantial rights of the defendant would be prejudiced thereby, in which event a reasonable postponement, not longer than the ends of justice require, may be granted. . . ."

■ A complete answer is found to appellant's claim in this regard under the rule that, generally speaking, an accused may waive his statutory rights by merely failing to enter a timely objection. (*People* v. *Suesser,* 142 Cal. 354, 357 [75 P. 1093]; *People* v. *Rodley,* 131 Cal. 240 [63 P. 351]; *People* v. *Lightner,* 49 Cal. 226; *People* v. *Flores,* 37 Cal.App. 2d 282 [99 P.2d 326]; *People* v. *Brown,* 83 Cal.App. 236 [256 P. 569].)

■ In the instant case there was a specific and direct waiver by appellant of any rights inuring to him under section 1049 of the Penal Code.

On March 24, 1953, when appellant was arraigned upon the amended information, the following occurred:

"THE COURT: Well, you have a right to be represented by an attorney and you are represented by Mr. Fay, is that right?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: You have a right to a jury trial, to the process of the Court for the purpose of bringing in witnesses to testify in your behalf, *and you have a right to a reasonable continuance.* What do you want to do now? (Emphasis added.)

"THE DEFENDANT: I want to go to trial Thursday (March 26, 1953) like it is already set up.

"THE COURT: What?

"MR. FAY (Counsel for Defendant): He wants to go to trial Thursday on both counts, your Honor."

It was at the request of appellant, concurred in by his counsel, after the court had offered a reasonable continuance, that the cause was set for trial on the second day after arraignment on the amended information. Appellant, therefore, cannot now be heard to complain.

 While appellant does not attack the sufficiency of the evidence to support the conviction of conspiracy as charged in Count I, he does challenge the sufficiency of the evidence to sustain the conviction under Count II wherein he was charged with soliciting for, or receiving money for soliciting for, a prostitute. This contention he predicates on the claim that Richard Hocking was the one who actually made the offer to the Mexican laborers to have sexual intercourse with Bettina Hocking. Appellant urges that this is true because he could not speak Spanish and the Mexican laborers could not speak English.

However, the record in the present case reflects that the negotiations were carried on by appellant asking Hocking (who spoke both English and Spanish) to inform the Mexican laborers that a girl was available; to inform the Mexican laborers that only one of them could come in the automobile at one time. Appellant also told Hocking to inform the Mexican laborers that the price was $5.00. It was appellant who made change for the money offered during the transaction. Hocking, who understood English, followed the directions given him by appellant. The latter is not any the less guilty when he carried on the foregoing and other negotiations in furtherance of his design and plan, through a third

person. (*People* v. *Torres,* 193 Cal. 730, 733 [227 P. 177].)

Even though it be conceded that appellant did not personally conduct the solicitations, nevertheless, he could be prosecuted as a principal because he aided and abetted Richard Hocking in the latter's activities (Pen. Code, § 31). Evidently unaware of the code provision just cited, appellant recognizes that he extended aid and abetted Hocking because, in his opening brief he says: "that a prosecution surrounding 'aiding and abetting' would have been more applicable in the premises." We regard the evidence as amply sufficient to uphold the conviction on Count II.

It is next contended by appellant that the district attorney was guilty of prejudicial misconduct during his argument to the jury. It is urged by appellant that his credibility was "unfairly impeached by the over-reaching of the prosecutor's summation speech to the jury."

When appellant was preparing, and at the time he filed his opening brief, he did not have that portion of the reporter's transcript containing the argument of the district attorney to the jury. Consequently, he was unable to point out in what respect he believed the argument to be unfair and prejudicial. However, on July 16, 1953, the county clerk of Ventura County, forwarded to appellant, via United States mail service, reporter's supplemental transcript, which contained the argument of the prosecutor. In his reply brief, filed October 26, 1953, after he was in possession of a copy of the district attorney's argument to the jury, appellant did not direct our attention to any portion of the argument in question which he claimed was in violation of his rights and prejudicial to him.

We have, however, read the argument of the prosecutor to the jury and nowhere therein do we find anything that constitutes prejudicial misconduct.

Appellant next urges that the crime of soliciting for a prostitute is not contained in the Penal Code and that the judgment under Count I is invalid because section 182 of the Penal Code prescribes punishment for conspiracy to commit only those crimes which are denounced in the Penal Code.

Prior to the amendment of Penal Code, section 182, in 1943, the language thereof may have been ambiguous to a degree that would warrant such a claim. However, the section now provides: "If two or more persons conspire:

"1. To commit any crime;

". . .

"They are punishable as follows:

"When they conspire to commit any felony, they shall be punishable in the same manner and to the same extent as is provided for the punishment of said felony."

But, prior to the 1943 amendment it was held, contrary to appellant's claim, that the words "any crime" as used in the first paragraph of section 182 included all crimes known to the law of this state, whether defined or made punishable by the Penal Code or by any other law or statute of the state (*Doble* v. *Superior Court,* 197 Cal. 556, 565 [241 P. 852]).

Appellant's claim that the "information charges double jeopardy" is without merit. Since he was tried but once no plea of twice in jeopardy can be made. (*People* v. *Chessman,* 38 Cal.2d 166, 193 [238 P.2d 1001]; *People* v. *Amick,* 20 Cal.2d 247, 251 [125 P.2d 25].)

Appellant's contention that punishing him separately for the violation of section 182 of the Penal Code (conspiracy) and for violation of section 1 of Act of 1907 of Deering's General Laws (soliciting or receiving compensation for soliciting for a prostitute) amounted to double punishment which is forbidden by section 654 of the Penal Code, cannot be sustained. The crime of conspiracy is a distinct offense from the commission of the crime forming the object of the conspiracy. Under the circumstances here one is not an essential part of the other. The crimes charged against appellant were separate and distinct offenses under the law, and the proof supporting convictions of both crimes was different as to each offense (*People* v. *Martin,* 114 Cal.App. 392, 396 [300 P. 130]; *People* v. *Gordon,* 71 Cal.App.2d 606, 628 [163 P.2d 110]). When two separate offenses arise out of the same transaction and when each offense is stated as a separate count and when the two offenses differ in their elements, and one is not included in the other, an accused may be convicted of the two offenses. As was said in the case of *People* v. *Chait,* 69 Cal.App.2d 503, 518 [159 P.2d 445], quoting from *People* v. *Hoyt,* 20 Cal.2d 306, 317 [125 P.2d 29], "The test is the identity of the offenses as distinguished from the identity of the transactions from which they arise." See, also, *People* v. *Roberts, supra,* p. 491.

For the foregoing reasons, the judgments are, and each of them is affirmed.

Doran, J., and Drapeau, J., concurred.